**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

PENG WANG, QINLIN LI, and YISI
WANG,

             *Plaintiffs*,

v.

             Case No. 4:25-cv-3103

KEN PAXTON, Attorney General of Texas,
in his Official Capacity, only.

             *Defendant*.

**MOTION FOR PRELIMINARY INJUNCTION**

## INTRODUCTION

SB 17 imposes discriminatory prohibitions on ownership and purchase of real property based on national origin, race, and ethnicity—and imposes especially draconian restrictions on people from China. Plaintiffs (including putative class members) are subject to SB 17s restrictions and its far-reaching harms. Without this Court's intervention, the law will go into effect on September 1, 2025, and Plaintiffs will be prohibited from purchasing or leasing homes, second homes, or investment properties. For some of the Plaintiffs, this will harm their financial interests or way of life. For others, it threatens their very ability to remain in Texas, or indeed, the United States.

Under Texas's discriminatory new law, people who are not U.S. citizens or permanent residents, and whose "domicile" is in China, will be prohibited from renting property in Texas for more than a year. They also will be prohibited from purchasing a second property, whether it is for vacation or investment. The law will apply equally to those from other countries hand-picked by the Governor, starting with Iran, Russia, and North Korea.

Texas's new law is preempted by federal law. Under Federal law, the right of aliens to purchase real estate is governed by a Congressionally-codified process that puts the power in the hands of the President, not individual states, to suspend or prohibit foreign acquisitions posing a threat to national security. Indeed, this regime was amended by Congress as recently as 2018. And, in doing so, Congress carefully balanced foreign affairs, national security, and individual rights, leaving no room for individual states to upset that balance.

Texas's new law also violates the Equal Protection Clause and is preempted by the Fair Housing Act. The law stigmatizes Plaintiffs and their communities. It casts a cloud of suspicion over anyone of Asian descent who seeks to buy property in Texas. SB 17 recalls the

wrongful animus of similar state laws from more than a century ago—laws that were eventually struck down by courts or repealed by legislatures. In May 1913, California enacted an "Alien Land Law," barring Asian immigrants from owning land. More than a dozen states, including Texas, followed suit, adopting similar Alien Land Laws restricting Asians' rights to hold land in America. Their purpose was to discourage and prevent non-desirable Asian immigrants from settling permanently in the United States and its territories. These laws were ultimately repealed or struck down by state courts as unconstitutional.

SB 17 is further preempted by the Fair Housing Act. It is also unconstitutional. SB 17 discriminates on the basis of national origin, race, and ethnicity. It likewise encourages private individuals to refuse to sell to those who look Chinese or have Chinese names, as it risks undoing sales and leases (at harm to sellers and landlords), based on characteristics of buyers that sellers would have no reason to know. Neither the Constitution nor the Fair Housing Act permits such second-class treatment.

## BACKGROUND

### A. The legislature passes SB 17.

On June 20, the Governor signed into law SB 17.

SB 17 prohibits Chinese citizens, agents, and members of the Chinese communist party from purchasing or leasing land in Texas, subject to certain exceptions. Tex. Prop. Code §§ 5.253, 5.253(4). Exceptions includes Chinese Citizens who are also U.S. citizens or permanent residents (who are exempted from SB 17 outright), Tex. Prop. Code. § 5.252(1), as well as (other than Chinese agents and members of the Chinese Communist Party) Chinese citizens who are lawfully present in the United States, but not U.S. citizens or permanent residents, and are somehow still domiciliaries in the United States. Tex. Prop. Code. §§

5.253(4)(A)-(B).[1] The law also excludes (again, other than Chinese agents and members of the Chinese Communist Party, here legally) Chinese citizens who are who are domiciliaries of a third country for which they have been made a naturalized citizen. Tex. Prop. Code. §§5.253(4)(B). The law and its prohibitions further apply to any company or organization majority-owned or under the control of a covered Chinese person, headquartered in China, "directly or indirectly controlled" by the Chinese government. Tex. Prop. Code. §§ 5.253(1)-(3).

Once the law applies, it forbids a covered person or entity from owning or leasing any home, land, or other form of property in Texas, subject to two exceptions. Tex. Prop. Code. §§5.253. First, any covered entity may lease property so long as that lease is for under a year. Tex. Prop. Code. §§5.252(3). Second, Chinese citizens who are domiciled in China (only), here legally, and are not Chinese agents or members of the Chinese Communist Party, may purchase (not lease for a year or longer) a home that the person intends to use as a homestead as that term is defined by the Texas tax code. Tex. Prop. Code. § 5.253(4)(A), Tex. Tax Code § 11.13(j).

Breaching SB 17 constitutes both a civil violation and a criminal violation with the potential for incarceration, Tex. Prop. Code. §§ 5.258-259. A court, at the request of the Attorney General, must seize and sell off property or cancel leases when the purchase or lease violates SB 17. Tex. Prop. Code. § 5.257. Although Texas law is unclear (as this is a new

---

[1] The term "domicile" is not defined, but under Texas law, it typically means the last place one resided in that one intended to make their permanent home. *See Gerlacher v. Board of Regents of University of Houston System*, 1997 WL 251343, at *2 (Ct. App. Tex. 14th Dist. May 15, 1997). Because of the requirement of permanence, it cannot generally apply to those who are not U.S. citizens or lawful permanent residents.

cause of action), typically in rem seizures do not require any pre-seizure notice of the property to the owner. *See, e.g.,* Tex. Crim. Pro. Art. 59.04(b).

The law also applies in similar fashion to Iran, North Korea, and Russia, Tex. Prop. Code. § 5.251(3)(A)[2], though China comes first when countries are described in SB 17. SB 17 § 1(a)(1). Countries can be added to or deleted from the law's restrictions based on either the Annual Threat Assessments of the U.S. Intelligence Committee, Tex. Prop. Code. § 5.251(3)(A), or the Governor's whim, *id.* § 5.254(a)(2). The Governor may separately declare entities or groups "a transnational criminal organization" and subject their members, however that may be determined, to the law's prohibitions as well. Tex. Prop. Code. § 5.254(a)(2). The Governor may separately designate or remove any company or organization from the law's reach, Tex. Prop. Code. § 5.253(2)(d), unless that company or organization is owned by U.S. citizens or lawful permanent residents and there is no ownership interest or control by any entity or organization covered by SB 17, Tex. Prop. Code. § 5.252(2).

The also gives the Attorney General substantial power to investigate and enforce violations of the law, record notices on property, adopt rules for implementation of SB 17, and refer violations to other law enforcement. Tex. Prop. Code. § 5.256.

SB 17 takes effect September 1, 2025. SB 17 § 8.

**B.     The Named Plaintiffs will all be harmed by SB 17.**

Mr. Peng Wang, currently on an F-1 visa, is a Chinese citizen that has lived in Texas for over 10 years. *See* P. Wang Decl. ¶¶ 1, 5. A devout Christian, he is currently pursuing a Master of Divinity at a seminary school in the Fort Worth area and plans to be a worship

---

[2]    *See* https://www.dni.gov/files/ODNI/documents/assessments/ATA-2025-Unclassified-Report.pdf.

pastor. *Id.* ¶ 6. Because an F-1 visa does not grant a right to permanent legal status, he cannot consider himself a domiciliary of Texas; despite having no real plans to return to China, *id.* at ¶ 8, he must consider themselves domiciliaries of China, *see* n.1, above.

He is currently a renter. *Id.* ¶ 8. His current lease expires this December. *Id.* Renting for less than a year will be too expensive. *Id.* ¶¶ 9-10. It also causes too much uncertainty if he has to move frequently due to constant living in short term rentals. *Id.* ¶ 10. And because Mr. Wang is a student in Fort Worth on a J-1 vias, leaving would mean terminating his studies at that school, *id.* ¶ 8, and potentially being forced to leave the country entirely, 8 C.F.R. § 214.2(f)(f)(i).

Qinlin Li, a Chinese citizen and recent graduate of the University of Texas A&M with a Master of Science degree in environmental engineering, is currently on an F-1 visa, though that visa will change to an H-1B visa in around October. Li Decl. ¶¶ 1, 5, 6. Because neither an F-1 visa nor an H1B visa grants a right to permanent legal status, she cannot consider herself a domiciliary of Texas. *Id.* ¶ 7; *see* n.1, above. She works as a water/wastewater treatment plant design engineer for a private company. *Id.* ¶ 8. Because of Texas's needs, she works over 50 hours a week. Li Decl. ¶ 8. Ms. Li is currently renting; her current lease expires August 15. *Id.* ¶ 9. As a renter, she prefers a one-year lease, as short-term rentals in the area are inconvenient, more expensive, and of poorer quality. *Id.* ¶ 10. Ms. Li would ultimately like to purchase a home because property ownership is the only way to ensure that homes are well maintained. *Id.* ¶ 13. But because her career will require him to spend time in multiple cities, she would like to buy a home in more than one location—which SB 17 prohibits. *Id.* ¶¶ 13-14.

Yisi Wang, also a Chinese citizen, has lived in the United States on an H1-B visa for nearly 16 years, living in Texas for over 7 years. Y. Wang Decl. ¶¶ 1, 6, 7. She is an actuary at an insurance company. *Id.* ¶ 6. She submitted a Form I-485 for adjustment of status to a lawful permanent resident (green card holder) for her and her family, but they have not reached their priority date for processing yet. *Id.* ¶ 8. Ms. Wang owns a home in Sugar Land but would like to purchase additional property in Texas as investment property. *Id.* ¶ 9. She has worked with an agent to look for appropriate purchases, and has submitted for a loan pre-approval with a loan broker. *Id.* Such purchases will be unlawful under SB 17 until Ms. Wang obtains her green card. *Id.*

## ARGUMENT

### I.      SB 17 is preempted by federal law governing foreign purchases of land.

In a carefully crafted set of statutes, regulations, and executive actions, a federal regime already addresses potential national security concerns related to real estate purchases. Federal law strikes a balance among competing considerations: the importance of foreign investment; potential national security issues; and the foreign affairs implications of interference with real estate purchases. SB 17 upends the balance.

Implied preemption can take two forms. *Castro v. Collecto, Inc.*, 634 F.3d 779, 785 (5th Cir. 2011). Field preemption occurs "where federal law is sufficiently comprehensive to make reasonable the inference that Congress left no room for supplementary state regulation, or the federal interest in the field is so dominant that it precludes enforcement of state laws on the same subject." *Janvey v. Democratic Senatorial Campaign Comm.*, 712 F.3d 185, 200 (5th Cir. 2013) (cleaned up). Conflict preemption occurs "(1) where complying with both federal law and state law is impossible; or (2) where the state law 'creates an unacceptable obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Id.* (cleaned up).

### A. CFIUS and FIRRMA regulate purchases of land by foreign nationals.

The federal government has a detailed and carefully calibrated system for monitoring, mitigating, and blocking certain real estate purchases if they threaten national security. *See* 50 U.S.C. § 4565(a)(4)(B)(ii), (d)(1); 31 C.F.R. Part 802. That system is built on a long history of federal monitoring of foreign investment for potential national security issues. In 1975, President Ford established the Committee for Foreign Investment in the United States ("CFIUS"), which is charged with reviewing foreign investments that could impact national security interests. E.O. 11858, 40 Fed. Reg. 20263. Congress codified CFIUS in 1988 and granted the President the authority to suspend or prohibit certain foreign acquisitions posing a threat to national security. Pub. L. 100-418, Title V, Section 5021, August 23, 1988; *see also* Foreign Investment and National Security Act of 2007, Pub. L. 110-49, 121 Stat. 246, July 26, 2007 (modifying responsibilities of CFIUS); *Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 302-04 (D.C. Cir. 2014) (describing CFIUS).

In 2018, Congress enacted and President Trump signed the Foreign Investment Risk Review Modernization Act of 2018 ("FIRRMA"), Pub. L. 115-232, which expanded the President's (and CFIUS's) authority to suspend or prohibit "certain types of real estate transactions involving the purchase or lease by, or a concession to, a foreign person." 84 Fed. Reg. at 50215. Specifically, the FIRRMA/CFIUS regime applies to "the purchase or lease by, or a concession to, a foreign person of private or public real estate" that is sensitive for national security reasons. *Id.* (citing 50 U.S.C. § 4565(a)(4)(B)(ii)).

FIRRMA empowers the President to review, and, if necessary, prohibit covered real estate purchases if "there is credible evidence that leads the President to believe" that the purchaser might "take action that threatens to impair the national security." 50 U.S.C. § 4565(d)(4). But real estate transactions in urbanized areas and involving single housing units are specifically exempted from review, limiting the President's power. 50 U.S.C. § 4565(a)(4)(C)(i).

Congress also created an individualized process for reviewing particular transactions and purchasers to assess whether they pose any national security threat. See 50 U.S.C. § 4565(d)(4). The process allows purchases and sellers to request a meeting with CFIUS to discuss a transaction under review. 31 C.F.R. § 802.601(b). CFIUS is also empowered to negotiate and enforce an "agreement or condition with any party to the covered transaction in order to mitigate any risk to the national security," 50 U.S.C. § 4565(l)(3)(A), which allows concerning purchases to proceed with adequate safeguards.

And Congress limited enforcement to civil penalties. Criminal liability attaches only where a person has made false statements to CFIUS; violations of the terms of any mitigation agreement are punishable only by civil penalties. 31 C.F.R. §§ 802.901(a)-(c), (g).

**B. SB 17 conflicts with the federal regime and foreign affairs authority.**

SB 17 "takes a different view as to what sort of foreign investment ought to be prohibited." *Jones Eagle LLC v. Ward*, No. 4:24-CV-00990-KGB, 2024 WL 5112477, at *17 (E.D. Ark. Dec. 9, 2024) (enjoining similar law in Arkansas). The Texas legislature made specific findings, with respect to China, that China's "dominance in the mining and processing of critical materials" is a "particular threat" to U.S. foreign policy. SB 127 § 1(a)(1)(A). Texas

accuses China of intellectual property theft, posing "health risks to the world," accelerating disinformation, and other perceived crimes of foreign affairs. *Id.* § 1(a)(1)(B)-(H).

As a result, SB 17 rejects the balance struck by Congress under CFIUS and FIRRMA. "Not only [does SB 17] infringe upon Congress's carefully considered calibration as to when foreign ownership interests in American real estate and businesses ought or ought not to be subject to scrutiny, [it] also purport[s] to deprive the President of the discretion to approve or deny specific foreign investments based on the criteria that Congress judged to be relevant in making such determinations—the very discretion which lies at the heart of the CFIUS regime." *Jones Eagle*, 2024 WL 5112477, at *17. This "clearly conflicts with the cautious, transaction-specific approach taken by Congress to foreign investment in FIRRMA." *Id.* It also "conflict[s] with FIRRMA's regime in terms of how they define foreign ownership." *Id.* By implementing CFIUS and FIRRMA, "Congress manifestly intended to limit economic pressure" against China and other countries "to a specific range." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 378 (2000). Likewise, by prohibiting certain purchases (such as single-housing real estate purchases, leases, and purchases in urbanized areas), the state Act "penalizes" behavior that "lie beyond the reach of the federal Act's restrictions." *Id.* at 379. "Sanctions are drawn not only to bar what they prohibit but to allow what they permit, and the inconsistency of sanctions here undermines the congressional calibration of force." *Id.* at 380.

In *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524 (5th Cir. 2013) (en banc), the Fifth Circuit struck down a law that, like this one, excluded from housing certain aliens who, even though they lacked legal status, had "no federal exclusion from housing," and criminalized their occupation of "a rented apartment or single-family residence." *Id.* at 532. "Federal law provides carefully calibrated definitions of the term 'qualified alien'

for the purpose of conferring benefits." *Id.* Once it does that, Texas has no ability to upset that by adding to or detracting from those benefits.

Worse, SB 17 classifies favored and disfavored citizens not only by country of origin but by location of domicile, whether they belong to a particular political party, and whether or not they are—in Texas's eyes, rather than the federal government's eyes—deemed an agent of what Texas deems a hostile state. These are not federal law classifications. And "[t]he federal government alone, however, has the power to classify non-citizens." *Villas at Parkside*, 726 F.3d at 536. By creating subclasses of Chinese and other nonimmigrant aliens, which decide who can and cannot purchase or lease land, and how much land they can purchase (but not lease), SB 17 interferes with the federal Government's foreign affairs powers.

Other Courts agree that land laws like Texas are preempted. As noted above, a Court in the Eastern District of Arkansas struck down Arkansas' similar law. *Jones Eagle*, 2024 WL 5112477, at *17, Similarly, Florida's version of this law was preliminarily enjoined pending appeal by the Eleventh Circuit. *Shen v. Fla. Dep't of Agriculture*, 23-12737, Doc. 59 (attached), at 2 (citing *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 419–27 (2003); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–88 (2000); and *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1280–88 (11th Cir. 2013)).

The District Court's contrary decision in *Shen v. Florida Department of Agriculture,* 687 F. Supp. 3d 1219, 1248-49 (S.D. Fla. 2023), rejecting *Crosby*, erred because it made a false distinction between "international diplomacy" laws which the District Court found susceptible to preemption, and "security" laws, which are not. But the District Court not only failed to cite any meaningful case supporting such a distinction, it ignored the substantial diplomatic effects that laws like Florida's and Texas's interfere with. The District Court also found that

"real estate transactions" "represent only one small part of the broader CFIUS regime," but again failed to explain why that would matter. *Id.* at 1249-50. Finally, citing to anti-canon decisions upholding racist Alien Land Laws, such as *Terrace v. Thompson*, 263 U.S. 197 (1923), *but cf. Trump v. Hawaii*, 585 U.S. 667, 710 (2018 (*Korematsu* "was gravely wrong the day it was decided"); *Oyama v. California*, 332 U.S. 633, 646 (1948) (casting doubt on *Terrace*), the District Court referred generally to "a history of state regulation of landownership." *Id.* at 1250. But a dated history that had not existed for decades prior to CFIUS tells us nothing about Congress's intent in passing CFIUS or CFIUS's effect.

Nor is it a defense to preemption that Texas law does not conflict with CFIUS and FIRRMA because Texas law merely adds to the restrictions placed on aliens by the federal regime. That was true in *United States v. Texas*, too, as that law tried to make some aliens' presence in Texas illegal even when the United States regime might have sanctioned such presence. 97 F.4th 268, 289-90 (5th Cir. 2024) (finding state law preempted); *see also Crosby*, 530 U.S. at 380 ("conflict is imminent" when "two separate remedies are brought to bear on the same activity"). "[C]onflicts are not rendered irrelevant" merely because the state and federal law "share the same goals" and that some regulated entities "may comply with both sets of restrictions." *Id.* at 379.

**C.    The field of foreign land ownership is entirely regulated by Congress.**

Finally, the same set of federal statutes, regulations, and executive orders also establishes field preemption, which applies where regulation in the area is "so pervasive" or touches on "a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Rice v. Santa Fe Elevator Corporation Illinois Commerce Comm'n*, 331 U.S. 218, 230 (1947). Here, the comprehensiveness

of the federal scheme to address national security and foreign policy concerns relating to foreign investments, including real estate transactions, demonstrates that Congress intended for federal law to occupy the entire field. Field preemption is thus warranted as "the federal government has both a dominant interest and a pervasive regulatory framework." *United States v. Texas*, 719 F. Supp. 3d 640, 663 (W.D. Tex.), *vacated on other grounds*, 144 S. Ct. 797 (2024), *and motion for stay pending appeal denied*, 97 F.4th 268.

CFIUS and FIRRMA make the power to decide when foreigners can buy land in the United States "***exclusively*** a federal power." *Id.* at 279 (emphasis original). This is the end of the analysis.

## II.    SB 17 is preempted by the Fair Housing Act.

The Fair Housing Act prohibits housing practices that discriminate based on race, color, religion, sex, familial status, or national origin, 42 U.S.C. § 3604(a)-(f). It further declares that "any law of a State … that purports to require or permit any action that would be a discriminatory housing practice under [the FHA] shall to that extent be invalid." *Id.* § 3615.

SB 17 falls into this express preemption against national origin discrimination. SB 17 restrictions apply only to people from China and other "designated countr[ies]." Tex. Prop. Code § 5.251(3). States rarely dictate housing policy in such overtly discriminatory terms, likely because doing so obviously violates the FHA. The FHA does not allow a state to "facially single out [a protected class] and apply different rules to them," as Texas has done here. *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir. 1995); *see Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289-90 (6th Cir. 1996) ("Here, the challenged portions of [the statute] are facially discriminatory…. Accordingly, this is a case of intentional discrimination or disparate treatment" under the FHA).

Worse, the law encourages discrimination against Chinese people regardless of whether they are directly covered by the law. The law undoes leases and potentially sales as well, through a receivership. Tex. Prop. Code § 5.257(1)(C). It potentially subjects sellers to investigation and even criminal penalties for their part in a sale. *See* Tex. Prop. Code § 5.256(2) (allowing investigation of potential violations on anyone in control of any evidence); Tex. Prop. Code § 5.257(2) (allowing criminal referrals for "any appropriate criminal offense in connection with the transaction"); *see also* Tex. Penal Code § 7.02 (aiding and abetting liability). And it does so based on information a seller is not ordinarily likely to know or even inquire about: where a seller is domiciled, what their immigration status is, or whether or not they are a foreign agent or a member of the Chinese Communist Party. The obvious and natural result will be to encourage sellers not to sell to anyone who might possibly come under the law—such as those who look Chinese, or have a Chinese last name, or speak Chinese or with a Chinese accent. *But see Astralis Condo. Ass'n v. HUD,* 620 F.3d 62, 69 (1st Cir. 2010) ("Astralis is duty bound not to enforce a statutory provision if doing so would either cause or perpetrate unlawful discrimination") (finding preemption).

Further, discrimination on the basis of race is Texas's own intent. *See* § III, below. Housing practices that intentionally discriminate based on race are also not permissible under the FHA. 42 U.S.C. § 3604. Nor are laws like SB 17 that will have an obvious disparate impact on Chinese people. *See Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Cmties. Project*, 576 U.S. 519, 540 (2015).

**III.**    **SB 17 violates the Equal Protection Clause.**

Of course, even absent the FHA, state laws that discriminate on the basis of race and national origin violate the Equal Protection Clause. *Bernal v. Fainter*, 467 U.S. 216, 219-22 & n.5 (1984).

**A. SB 17 discriminates on the basis of national origin and race.**

Discrimination on the basis of national origin is also unlawful absent meeting strict scrutiny. *See, e.g., City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439-40 (1985). The law expressly discriminates on those who are from China (as well as other designated countries), regardless of where they are domiciled, so long as they are not U.S. citizens or lawful permanent residents.

SB 17 also discriminates on race because racial discriminatory intent was a "motivating factor" behind the law, and it will have a discriminatory impact on the individual plaintiffs. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977). The *Arlington Heights* inquiry examines the historical background of the government action, contemporary statements of legislators, the impact of the challenged law, foreseeability of disparate impact, knowledge of impact, and availability of less discriminatory alternatives. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1322-23 (11th Cir. 2021).

A review of these factors, and especially the law's incredible overinclusiveness, establish an intent to discriminate against Chinese people (in particular), not just the government of China. *See, e.g., Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 899 (9th Cir. 2018) (overinclusiveness "indicia of discriminatory motive") (citation omitted). For instance, Governor Abbott was not interested in a proportionate response to a threat, and demanded "the toughest ban in the U.S. to prohibit people from hostile foreign nations like China" from "buying

or owning land in Texas."[3] Similarly, upon signing the bill, Abbott's press secretary Andrew Mahaleris justified its necessity based on "Chinese nationals" who were purportedly "attempting to smuggle bioweapons in Michigan," although those accusations have nothing to do with land use.[4] Regardless of Texas's purported arguments that this was a measured national security response, their statements and actions show that this was simply a way to hurt Chinese people.

### B. Texas cannot satisfy strict scrutiny.

Because SB 17 is expressly discriminatory, strict scrutiny applies, and the state bears the burden of establishing that its conduct is narrowly tailored to a compelling government interest. Here, the Attorney General cannot meet this burden.

Although national security often qualifies as a "compelling interest" of the federal government, it is doubtful that *a state* can simply invoke national security when defending against a constitutional challenge—particularly where, as here, Texas's blunt action is at odds with the federal government's nuanced approach to issues implicating foreign affairs, foreign investment, and national security. Indeed, to the extent that Texas is attempting to survive strict scrutiny by claiming that its purposes are different than the federal government's interests of national security and international diplomacy under CFIUS and FIRRMA, it has even further positioned itself out of any way to meet the strict scrutiny test.

Regardless, SB 17 fails to satisfy this prong of the test because it does not "actually further[]" national security or any other compelling interest. *See Holt v. Hobbs*, 574 U.S. 352, 364 (2015); *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 438 (2006).

---

[3] https://x.com/GregAbbott_TX/status/1921725041474949329.
[4] *Id.*

There is no evidence that Chinese buyers of property in Texas, for instance, are agents of the Chinese Communist Party or have caused harm to national security. Nor has Texas identified any nexus between real estate ownership by Chinese citizens generally and the various harms they allege China is partaking in in SB 17, such as collecting data, stealing intellectual property, suppressing criticism of China, and disseminating disinformation. SB 17 § 1(a)(1). Even as to the one allegation specific to real property—"mining and processing of critical materials"—SB 17 is substantially overbroad. Texas does not deign even to identify what materials are critical, much less limit its restrictions to land where such minerals are likely to, or even legally possible to, be mined.

It is true that in a series of cases decided 100 years ago, the Supreme Court upheld state "alien land laws" that discriminated against certain "aliens ineligible for naturalization," applying a standard less demanding than strict scrutiny, even though those laws arguably targeted individuals based on race and national origin. *See, e.g., Terrace v. Thompson*, 263 U.S. 197 (1923); *Frick v. Webb*, 263 U.S. 326, 333 (1923).

But those cases predated several critical developments in equal protection law, including: (1) the Court's modern articulation and application of the strict scrutiny test to laws that discriminate based on national origin, race, or ethnicity, *see* Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1297 (2007) (modern strict scrutiny test did not emerge until the 1960s); (2) the Court's decision in *Oyama v. California*, 332 U.S. 633, 646 (1948), casting doubt on those cases, and (3) the Court's explicit adoption of strict scrutiny for state laws discriminating on the basis of alienage, *see Bernal*, 467 U.S. at 219; *Graham*, 403 U.S. at 371-72. By the 1950s, several state supreme courts had struck down their state alien land laws as violating the Fourteenth Amendment, recognizing that Terrace and similar cases had been

superseded by developments in equal protection law. *See Fujii v. State*, 38 Cal. 2d 718, 725-38 (1952); *Namba v. McCourt*, 185 Or. 579, 611 (1949); *State v. Oakland*, 129 Mont. 347, 352 (1955).

For this reason, in a concurring opinion, Judge Abudu found Florida's similar law violated the Equal Protection Clause. *Shen* Slip. Op. at 5-9. (The other two judges on the panel did not reach the Equal Protection Clause issue.) As Judge Abudu explained (slip op. at 9), the District Court's rejection of the Equal Protection Cause claim based on the *Terrace* cases was in error.

### C. Texas cannot satisfy rational basis scrutiny.

Even if rational basis scrutiny applies, the Government still loses. Rational basis scrutiny is not a rubber stamp. There must still be a "legitimate government objective," and there must be a rational basis for the classification of disfavored individuals singled out by a law in light of that purpose. *Stefanoff v. Hays Cnty., Tex.*, 154 F.3d 523, 525 (5th Cir. 1998); *Newman Marchive P'ship, Inc. v. Hightower*, 349 F. App'x 963, 965 (5th Cir. 2009) (unpublished). The problem for SB 17 is, because the national security concerns about immigrants from China cannot be a legitimate state government interest, *see* § I, above, and because Texas can have no legitimate interest in subclassifying immigrants by nationality, domiciliary, political belief or party membership, or any other form of classification different from federal law, *Villas at Parkside*, 726 F.3d at 532; *see also Arizona Dream Act Coal. v. Brewer,* 855 F.3d 957, 975 (9th Cir. 2017), Texas is left with no legitimate government interest upon which to base its law's discrimination against Chinese aliens under the law. Without a legitimate government interest to point to at all, the classification of disfavored aliens cannot meet even rational basis scrutiny.

## IV.   All remaining factors support a preliminary injunction.

Besides success on the merits, Plaintiffs meet the remaining factors for a preliminary injunction. *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023).

The threat of irreparable injury is manifest. As the factual background and attached declarations show, Plaintiffs will suffer irreparable harm from not being able to enter into real estate transactions. Mr. Peng Wang will have to either incur substantial additional costs or move out of Texas if SB 17 were to go into effect. And because Mr. Wang is on an F-1 visa, leaving Texas likely means leaving the country. Ms. Qinlin Li likewise may likely have to leave Texas. And while she would eventually like to purchase a home in Texas (which would be permitted under the homestead exception), she also would like to purchase a second home in Houston—which SB 17 would still prohibit. And Ms. Yisi Wang's desire to purchase investment property will need to remain indefinitely on hold until her green card is processed and approved. This is irreparable injury. *E.g. Tioronda, LLC. v. New York,* 386 F. Supp. 2d 342, 350 (S.D.N.Y. 2005) ("deprivation of an interest in real property constitutes irreparable harm"); *Entine v. Lissner*, 2017 WL 5507619, at *9 (S.D. Ohio Nov. 17, 2017) (inability to live where one wants is irreparable harm); *Portee v. Morath*, 683 F. Supp. 3d 628, 636 (W.D. Tex. 2023) (inability to enter into preferred business or profession irreparable harm).

Meanwhile, Texas has no interest in enforcing a law that violates federal law or the Constitution. *Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024). And, similarly, the public interest is never "harmed by preventing the enforcement of unconstitutional laws and unlawful rules." *Smith v. Dep't of Treasury*, 761 F. Supp. 3d 952, 972 (E.D. Tex. 2025) (stringcite omitted).

### V. Relief should flow to all putative class members.

It is true that *Trump v. CASA*, 605 U.S. ---, 2025 WL 1773631 (U.S. June 27, 2025), eliminated (at least for claims against the federal government) universal injunctions. But likewise, during this same term, the Court reaffirmed that "courts may issue temporary relief to a putative class." *AARP v. Trump*, 145 S. Ct. 1364, 1369 (2025); *see also CASA*, 2025 WL 1773631, at *19 (Kavanaugh, J., concurring). And there is no need to "decide whether a class should be certified" prior to doing so. *A,A,R,P.*, 145 S. Ct. at 1360; *see also Zaragoza v. Union Pacific Ry. Co.*, 112 F.4th 313, (5th Cir. 2024) ("a putative class is defined by the plaintiffs' operative complaint, at least until that class is certified, when the district court's certification order supplants the definition as pled"). Instead, "a district court may, in its discretion, award appropriate classwide injunctive relief prior to a formal ruling on the class certification issue based upon either a conditional certification of the class or its general equity powers." *Alex A. by & through Smith v. Edwards*, 2022 WL 3701169, at *3 (M.D. La. Aug. 26, 2022) (citation omitted).

### CONCLUSION

The Court should find SB 17 preempted, or, in the alternative, unconstitutional under the Equal Protection Clause, and strike it down its entirety. At minimum (depending on the Court's reasoning), the Court should strike SB 17 down as it relates to China. Plaintiffs respectfully request that the relief extend to the putative class and subclasses. Plaintiffs further respectfully request that their motion be resolved prior to the law's effective date of September 1, 2025.

July 3, 2025

Respectfully submitted,

s/ Justin Sadowsky
Justin Sadowsky (SDTex 3713277, VA Bar 73382)
*Attorney in charge*
CHINESE AMERICAN LEGAL DEFENSE
ALLIANCE
4250 N. Fairfax Drive #600
Arlington, VA 22203
646-785-9154 (no fax number)
justins@caldausa.org


Keliang (Clay) Zhu* (CA Bar No 178170)
Andre Y. Bates* (CA Bar No 305509)
CHINESE AMERICAN LEGAL DEFENSE
ALLIANCE
7901 Stoneridge Drive #208
Pleasanton, CA 94588
925-399-6702 (no fax number)
czhu@dehengsv.com
aybates@dehengsv.com


*Motion for admission pro hac vice forthcoming